## 27525. PULLMAN COMPANY *v.* CARTER.

Decided November 29, 1939. Rehearing denied December 20, 1939.

*Howell & Post,* for plaintiff in error. *E. Harold Sheats,* contra.

MacIntyre, J. This is a workmen's compensation case and was first heard before a single director who allowed compensation. The Industrial Board unanimously entered an award denying compensation. On appeal to the superior court the judge passed an order setting aside the findings of the Industrial Board and remanded the case to the Industrial Board. To this ruling the plain-

tiff in error (employer) excepted on the ground that the evidence demanded the conclusion of· the board that the injury to Carter (the claimant) was caused by his own wilful misconduct in that he wilfully failed and refused to use a safety appliance provided by his employer.

Norwood C. Carter, the claimant, was employed by the Pullman Company as an electrical helper and apprentice. His particular duty was to service Pullman cars while on stand-by service, that is to say, to check and adjust all electrical fixtures including the air-conditioning equipment, ·pre-cool the car, which necessitated plugging in the plug, and see that the car was in condition to carry on until time for complete overhauling. The Pullman cars are equipped with air-conditioning equipment, including a fan, all of which is operated by electricity. When the car is running the current is furnished by a generator in the car. When the car is still no ·electricity is furnished unless through the stand-by cable which connects with the regular power company current. This cable is attached to a receptacle (socket) beneath the overhang of the side of the car. The receptacle has a cover which must be lifted and opened in order to attach the cable or keep it attached. In other words, if the cable is detached the cover to the receptacle is closed and no current can enter to run any part of the air-conditioning equipment. The air-conditioning equipment consists of a large, two-bladed fan, enclosed in a wire guard, a condenser, valves, and a compressor. The motor is hung over the center of the car and transmits the power to the fan belt by means of a double V-shaped belt operating on pulleys on the motor shaft and the fan shaft. The belt enters and returns through an opening fan guard. The motor operates at a speed of 1750 revolutions per minute, and the pulley on the motor being larger than the pulley on the fan the fan has a speed of approximately 3500 revolutions per minute. The bottom of a Pullman car is approximately four feet above the ground, and extends beyond the rail approximately three feet. The Pullman Company furnishes a safety appliance, to wit, a "Do Not· Apply Cable" sign, a failure to use which, the defendant company contends, amounts to wilful misconduct. This sign is rectangular in shape, being 7½ by 11 inches, with letters seven-eighths of an inch high. It hangs by a chain and is to be hung over the receptacle or socket when one is working on· the air-conditioning

equipment under the car, and the sign can not be attached unless the receptacle is closed. When the sign is attached in its proper place by an employee no other employee is supposed to remove it and plug in the cable.

The question here to be determined is whether the accident was caused by the "wilful misconduct" of the claimant within the meaning of the Code, § 114-105, which provides: "No compensation shall be allowed for an injury or death due to the employee's wilful misconduct, including intentionally self-inflicted injury, or growing out of his attempt to injure another, or due to intoxication or wilful failure or refusal to use a safety appliance or perform a duty required by statute, or the wilful breach of any rule or regulation adopted by the employer and approved by the Department of Industrial Relations, and brought to the knowledge of the employee prior to the accident. The burden of proof shall be upon him who claims an exemption or forfeiture under this section." The case of Wick v. Gunn, 66 Okla. 316 (169 Pac. 1087, 4 A. L. R. 107, 112), states: "The mere intentional and voluntary failure on the part of a workman to use a proper safety appliance does not necessarily make the act wilful as contemplated by the exception under consideration. The wilfulness contemplated amounts to more than a mere act of the will, and carries with it the idea of premeditation, obstinacy, and intentional wrongdoing." In Bersch v. Morris & Co., 106 Kan. 800 (189 Pac. 934, 9 A. L. R. 1374, 1377), it is said: "The meaning of the word 'wilful,' as used in the statute, includes the element of intractableness, the headstrong disposition to act by the rule of contradiction. Such is a general and popular signification of the term. 'Governed by will without yielding to reason; obstinate; perverse; stubborn; as, a wilful man or horse.' " The Supreme Court of Massachusetts, in the case of In re Nickerson, 218 Mass. 158 (105 N. E. 604, Ann. Cas. 1916A, 790), held: "Where an employee, engaged in cleaning and painting, began work around a moving shaft shortly before noon, although he had been ordered to do that work during the noon hour, while the machinery was stopped, his disobedience was a thoughtless act on the spur of the moment, rather than deliberate disobedience, and does not deprive his dependent of compensation under the workmen's compensation act." See in this connection General American Tank

Car. Cor. v. Borchardt, 69 Ind. App. 580 (122 N. E. 433) ; Bersch v. Morris & Co., supra.

If the sign, which was designated as the safety appliance in the instant case, was attached in the place where it was intended to be used, it would hang over the socket and prevent the plugging in of an electric cable through which electricity would travel to run the equipment. The evidence disclosed that while the plug was in the socket and the equipment was in operation and no sign was hanging over the socket the claimant heard a knock somewhere in the equipment, and when he finished filling the water tank he began trying to locate the knock in order that he might, if he could, temporarily repair the equipment. The Industrial Board found that "the only reasonable deduction to be drawn from the evidence is that while claimant was looking into the fan with all of his body under the car with the possible exception of his legs, his hand was caught in the fan by the belt or by his accidentally sticking his hand through the fan-guard opening, and his hand was immediately cut off by the fan. The accident occurred with such suddenness that claimant did not know exactly how it happened, as he testified." No one was present except the claimant at the time of the accident. He testified that he did not voluntarily go under the car but that his foot slipped and he was thrust thereunder. The foreman testified in effect that it was the duty of the claimant to locate trouble in the equipment and temporarily repair the same for operation until it could be overhauled, that it was permissible for claimant to insert the plug in the socket, and that the best way to locate a knock was to run the motor, the fan, and other equipment.

In considering this case let us treat as correct the finding of the Industrial Board as to where claimant's body was at the time of the injury. It seems to us clear that the only practical way to locate a knock in the motor or equipment in the instant case would be to run or have in motion the machinery, for the knock could not be heard or located unless the equipment was running and the sign or safety device was not in use. The claimant, under the facts in this case, was allowed and permitted, under any reasonable construction of the law, to allow the machinery to revolve, and therefore not put up the sign (or use the safety device) until he had located the knock, and if it was necessary, in order to listen to and

locate the knock, to go under the car while the machinery was running, he was permitted to do so. For in the process of performing his prescribed duty, that of locating the knock, the stage, at the time the claimant was injured, had not been reached when the sign should be put over the socket, or, in other words, when the safety appliance should be used, for to have applied the safety appliance at this stage would have prevented the locating of the trouble. In interpreting the statute as to the use of safety appliances, that is as to when the sign in this case should have been placed over the socket, we think we should give it a reasonable interpretation and give to the words thereof their usual and most-known signification; "Not so much regarding the propriety of grammar, as their general and popular use. Thus the law mentioned by Puffendorf which forbade a layman to *lay hands* on a priest, was adjudged to extend to him who had hurt a priest with a weapon." 1 Cooley's Blackstone, 4th ed., 53. Code, § 114-105, which requires the use of a safety device, which in this case was the hanging up of a sign and thus forbid the insertion of the plug in the socket, does not extend to the placing of the sign over the socket and stopping the running of the machine so as to prevent the application of a part of the process which was necessary in the performance of the employee's prescribed duty. The claimant was not necessarily at fault in allowing the motor and fan to continue to revolve in order that he might use the universally practical method of listening in order that he might locate a knock in the machinery. The foreman himself admitted that the equipment should be revolving in order to listen to and locate the knock, which could not have been done if the claimant had hung up the sign, for in order to hang up the sign the plug would have to be withdrawn, the electric current disconnected, and the machine stopped. If, in standing beside the car and "while the claimant was looking into the fan," his feet and legs not under the car, he leaned under the car with his body extending under the car, as decided by the board, the fault if any lay not in a failure to stop the machine by using the sign which would have necessitated the withdrawal of the plug, but consisted in allowing his body to protrude under the car, and even if this was contrary to instruction, and even if it be said that he was guilty of conscious voluntary omission, he did not, as to allowing his body to protrude under the car, mean, according to the findings of

the board, to oppose his will to the will of the employer in any perverse and refractory sense and thus make his conduct "wilful misconduct" within the contemplation of the statute, in that he violated a rule of the employer which had been approved by the Industrial Board, because the board found that the rule prohibiting an employee from going under the car while the cable was attached had not been approved by the board and compensation would not be denied because of a violation of this rule. See *Integrity Mutual Casualty Co.* v. *Jones,* 33 *Ga. App.* 489 (2) (126 S. E. 876). The board found that "had there been no wilful failure and refusal to use the safety appliance the accidental injury, under the facts established by the evidence, would have arisen out of and in the course of his employment and would have been compensable, as found by the hearing director." Yet the board also said in the findings: "Under the circumstances all of the directors find as a matter of fact, and rule as a matter of law, that claimant wilfully failed and refused to use a safety appliance provided by his employer; and that such wilful failure and refusal to use the safety appliance resulted in claimant's accidental injury, and claimant's injury was due entirely to wilful misconduct on his part. (Section 114-105 of the Code of 1933, section 14 workmen's compensation act.)" The evidentiary facts found by the board do not authorize a finding by it of the ultimate fact that claimant was guilty of "wilful misconduct," but on the contrary conclusively shows that the plaintiff was injured in the course of his employment; that said injury did not result from the failure to use the safety appliance in legal contemplation; but that his injury was due to allowing his body or hand or both to protrude under the car while the fan was revolving.

In *Ætna Life Ins. Co.* v. *Carroll,* supra, the Supreme Court said: "Wilful misconduct includes all conscious or intentional violations of definite law or rules of conduct, *obedience to which is not discretionary,* as distinguished from inadvertent, unconscious, or involuntary violations." (Italics ours.) In that case it is also said: "If the workman is acting within the scope of his employment, mere disregard of a rule or order does not become such misconduct, unless the disobedience be in fact wilful or deliberate, and not a mere thoughtless act done on the spur of the moment." However, in headnote 1-d it is said: "Wilful misconduct includes

all conscious or intentional violations of definite law or rules of conduct, as distinguished from inadvertent, unconscious, or involuntary violations." The conduct complained of in that case was conduct which violated a criminal statute, an obedience to which was not discretionary, and the test of misconduct in such a case (violating a criminal statute) "is not the doing of an act for the purpose of and with a specific intent of violating the statute, but the wilful and conscious doing of the act which is in violation of the statute." *Ætna Life Ins. Co.* v. *Carroll,* supra. In *Liberty Mutual Ins. Co.* v. *Perry,* 53 *Ga. App.* 527 (186 S. E. 576), Judge Stephens, speaking for this court, in headnote 2 quoted from *Ætna Life Ins. Co.* v. *Carroll,* supra, which is quoted above. Judge Stephens in effect said that under the facts of that case obedience to the rule was not discretionary. He was not stating that obedience to rules of conduct was never discretionary for "the phrase 'wilful misconduct' as used in the [workmen's compensation] act, includes all conscious or intentional violations of definite law or definitely prescribed rules of conduct, as to which obedience is not discretionary, as contradistinguished from inadvertent, unconscious, or involuntary violations thereof" (Ex Parte Woodward Iron Co., 212 Ala. 220, 223, 102 So. 103), and "the mere voluntary and intentional omission of a workman to use a guard or protection furnished to him is not necessarily to be regarded as wilful." Bersch *v.* Morris & Co., supra. In the instant case obedience to the rule was discretionary as to that phase of the rule which applied to the listening to the running of the fan and equipment. In other words, the use of the safety appliance was discretionary, because the fan could not be run if the safety appliance was attached, and in employing the "best way" to locate the knock and to perform this particular phase of the employee's duty it might have been necessary for the machinery or equipment to run and the claimant to lean under the car in order to listen to the knock. The foreman testified, in effect, that one of the best means of determining where trouble is is to listen to the machinery while it is running, and we do not think it a reasonable construction of the law and the rule for the board to hold that under any and all circumstances the leaning under the car to listen for a knock while the equipment was running was "wilful misconduct."

The order of the superior court setting aside the award of the Industrial Board denying compensation is therefore

*Affirmed. Broyles, C. J., and Guerry, J., concur.*

ON MOTION FOR REHEARING.

MacIntyre, J.  In its motion for rehearing the movant contends "that it would, without any exceptions, be a violation of the safety rules and Carter's duties for him to go under a car to inspect or work on air-conditioning equipment unless the said safety appliance [the 'Do Not Apply Cable' sign] was in place." The following occurred while the foreman was being examined as a witness: Q. "If any part of the body got under the car, that constituted going under the car. Now let's see, it was Carter's duty to fill the water tank, was it not?" A. "Yes, I think our rules say 'anything to draw the work to a successful conclusion,' I think." Q. "And the object in mind was to see that the air-conditioning equipment on that car was in perfect shape, that was the object in mind?" A. "Well, now I would not say 'perfect.'" Q. "Well, in good running condition?" A. "Yes, so it would get to the next point." Q. "And it was in Carter's regular line of duty to run over the equipment in this car, look it over, listen to it, see how it was operating, read the gauges, and see that it was in condition to get it over to the next time it would be overhauled completely?" A. "That is right." Q. "You are familiar with the working of machines, electric motors and things like that, is it not true that one of the best means of determining where trouble is is by the sound of it?" A. "Yes."

The board in effect found that the claimant's going partly or entirely under the car, if the machinery was not running, was not "wilful misconduct," but that the mere leaning under the car while the machinery was running was, under any and all circumstances, "wilful misconduct," and in effect said that the claimant was precluded at all stages in the performance of his duty from using the best method of performing it. We can not but feel that the board adopted the literal meaning of the sign, and failed to consider the reason and spirit of the law and the rule, and held in effect that the mere failure to put up the sign was in and of itself, under any and all circumstances and conditions, "wilful and wanton misconduct," just as in a criminal case the mere doing of a prohibited criminal act makes it a crime, because obedience to a criminal law,

as to the criminal act prohibited, is not and can not be a matter of discretion vested in the actor.

One of the definitions given by Webster in his New International Dictionary of the word "sign" is "a lettered board, or other conspicuous notice," and it also defines it as "a publicly-displayed token or notice." The word "signboard" is defined therein as "a board for or bearing a notice or sign." Thus we think, generally speaking, that where a rule requires letters or words to be displayed on a board and hung in a certain conspicuous place, the reasonable construction of such a rule is that the purpose of so doing is to call attention to or give notice of something. Then, what was this "Do Not Apply Cable [and start the machinery]" sign put up for? We think it was for the purpose of calling attention to the fact that a workman or some one was working under the car, and that to plug in the cable would endanger the life or limb of the person thereunder. The sign itself does not say or indicate that no one should go under the car, but rather indicates that no one on the outside of the car should plug in the cable when the sign was up. It would seem that when a workman was under the car he should put the sign up in order that he might not be taken unaware by the starting of the machinery or equipment by *some one else* while he was thereunder. Suppose, for instance, while standing near, but not under the car, a workman thought he had located the knock and stopped the motor, put up the sign, and got under the car and repaired what he thought was causing the knock, then got out from under the car, plugged in the cable and started the motor and the knock still continued. If then it was necessary to start the machinery and lean under or go entirely under the car in order to hear and locate the knock, could he not do so without being guilty of "wilful misconduct"? We think he could. The foreman said that the best way to locate the knock was to run the machinery and listen. Then, in the first instance, where the machinery was already running and knocking, and it was necessary for the workman to lean under the car in order to locate the knock, he would not be guilty of "wilful misconduct" in so doing. We should give the statute and the rule of the company requiring the putting up of the sign a reasonable construction. "The Bolognian law, mentioned by Puffendorf, which enacted 'that whoever drew blood in the streets should be punished with the utmost severity,' was held after

long debate not to extend to the surgeon who opened the vein of a person that fell down in the street with a fit." 1 Cooley's Blackstone (4th ed.), 54. So, "after long debate" in the instant case, we hold that the reasonable construction is that the claimant did not have to notify himself in writing by a sign or otherwise that the machinery was running when he already knew it and could and should act accordingly. If a citizen or fellow workman of the person who fell down in the streets of Bologna, or even a lawyer, one expert in the law, should have testified merely that a doctor, under his construction of the law, should be punished for drawing the blood of a person upon the streets of Bologna, such testimony would not change the reasonableness of the construction of the Bolognian law; and here, even if the foreman should testify that the claimant, in the performance of his duty, must or should locate the knock, but should not go near enough to the machinery to hear the knock, nevertheless, it would not make his construction a reasonable one. We might recall the following doggerel in this connection:

"Mother may I go out to swim?
Yes, my darling daughter,
Hang your clothes on a hickory limb
But don't go near the water."

We do not think it was a reasonable construction of the safety-appliance law for the Industrial Board to hold in effect that under any and all circumstances, before a workman could go under the car for the purpose of locating trouble, he must hang up the sign and stop the running of the machinery. For, under some circumstances, the best method of performing his duties would have been to start the machinery and listen, even though it might be necessary for him to lean under the car in order to hear the knocks.

*Rehearing denied. Broyles, C. J., and Guerry, J., concur.*